*368 Justice Souter
delivered the opinion of the Court.
The issue here is whether a 13-year-old student’s Fourth Amendment right was violated when she was subjected to a search of her bra and underpants by school officials acting on reasonable suspicion that she had brought forbidden prescription and over-the-counter drugs to school. Because there were no reasons to suspect the drugs presented a danger or were concealed in her underwear, we hold that the search did violate the Constitution, but because there is reason to question the clarity with which the right was established, the official who ordered the unconstitutional search is entitled to qualified immunity from liability.
I
The events immediately prior to the search in question began in 13-year-old Savana Redding’s math class at Safford Middle School one October day in 2003. The assistant principal of the school, Kerry Wilson, came into the room and asked Savana to go to his office. There, he showed her a day planner, unzipped and open flat on his desk, in which there were several knives, lighters, a permanent marker, and a cigarette. Wilson asked Savana whether the planner was hers; she said it was, but that a few days before she had lent it to her Mend, Marissa Glines. Savana stated that none of the items in the planner belonged to her.
Wilson then showed Savana four white prescription-strength ibuprofen 400-mg pills, and one over-the-counter blue naproxen 200-mg pill, all used for pain and inflammation but banned under school rules without advance permission. He asked Savana if she knew anything about the pills. Savana answered that she did not. Wilson then told Savana that he had received a report that she was giving these pills to fellow students; Savana denied it and agreed to let Wilson search her belongings. Helen Romero, an administrative assistant, came into the office, and together with Wilson they searched Savana’s backpack, finding nothing.
*369 At that point, Wilson instructed Romero to take Savana to the school nurse’s office to search her clothes for pills. Romero and the nurse, Peggy Sehwallier, asked Savana to remove her jacket, socks, and shoes, leaving her in stretch pants and a T-shirt (both without pockets), which she was then asked to remove. Finally, Savana was told to pull her bra out and to the side and shake it, and to pull out the elastic on her underpants, thus exposing her breasts and pelvic area to some degree. No pills were found.
Savana’s mother filed suit against Safford Unified School District #1, Wilson, Romero, and Sehwallier for conducting a strip search in violation of Savana’s Fourth Amendment rights. The individuals (hereinafter petitioners) moved for summary judgment, raising a defense of qualified immunity. The District Court for the District of Arizona granted the motion on the ground that there was no Fourth Amendment violation, and a panel of the Ninth Circuit affirmed. 504 F. 3d 828 (2007).
A closely divided Circuit sitting en bane, however, reversed. Following the two-step protocol for evaluating claims of qualified immunity, see Saucier v. Katz, 533 U. S. 194, 200 (2001), the Ninth Circuit held that the strip search was unjustified under the Fourth Amendment test for searches of children by school officials set out in New Jersey v. T. L. O., 469 U. S. 325 (1985). 531 F. 3d 1071, 1081-1087 (2008). The Circuit then applied the test for qualified immunity, and found that Savana’s right was clearly established at the time of the search: “ '[tjhese notions of personal privacy are “clearly established” in that they inhere in all of us, particularly middle school teenagers, and are inherent in the privacy component of the Fourth Amendment’s proscription against unreasonable searches.’” Id., at 1088-1089 (quoting Brannum v. Overton Cty. School Bd., 516 F. 3d 489, 499 (CA6 2008)). The upshot was reversal of summary judgment as to Wilson, while affirming the judgments in favor of Sehwallier, the school nurse, and Romero, the administrative *370 assistant, since they had not acted as independent decision-makers. 531 F. 3d, at 1089.
We granted certiorari, 555 U. S. 1130 (2009), and now affirm in part, reverse in part, and remand.
II
The Fourth Amendment “right of the people to be secure in their persons . . . against unreasonable searches and seizures” generally requires a law enforcement officer to have probable cause for conducting a search. “Probable cause exists where ‘the facts and circumstances within [an officer’s] knowledge and of which [he] had reasonably trustworthy information [are] sufficient in themselves to warrant a man of reasonable caution in the belief that’ an offense has been or is being committed,” Brinegar v. United States, 338 U. S. 160, 175-176 (1949) (quoting Carroll v. United States, 267 U. S. 132, 162 (1925)), and that evidence bearing on that offense will be found in the place to be searched.
In T. L. O., we recognized that the school setting “requires some modification of the level of suspicion of illicit activity needed to justify a search,” 469 U. S., at 340, and held that for searches by school officials “a careful balancing of governmental and private interests suggests that the public interest is best served by a Fourth Amendment standard of reasonableness that stops short of probable cause,” id., at 341. We have thus applied a standard of reasonable suspicion to determine the legality of a school administrator’s search of a student, id., at 342, 345, and have held that a school search “will be permissible in its scope when the measures adopted are reasonably related to the objectives of the search and not excessively intrusive in light of the age and sex of the student and the nature of the infraction,” id., at 342.
A number of our cases on probable cause have an implicit bearing on the reliable knowledge element of reasonable suspicion, as we have attempted to flesh out the knowledge com *371 ponent by looking to the degree to which known facts imply prohibited conduct, see, e. g., Adams v. Williams, 407 U. S. 143, 148 (1972); id., at 160, n. 9 (Marshall, J., dissenting), the specificity of the information received, see, e. g., Spinelli v. United States, 393 U. S. 410, 416-417 (1969), and the reliability of its source, see, e. g., Aguilar v. Texas, 378 U. S. 108, 114 (1964). At the end of the day, however, we have realized that these factors cannot rigidly control, Illinois v. Gates, 462 U. S. 213, 230 (1983), and we have come back to saying that the standards are “fluid concepts that take their substantive content from the particular contexts” in which they are being assessed, Ornelas v. United States, 517 U. S. 690, 696 (1996).
Perhaps the best that can be said generally about the required knowledge component of probable cause for a law enforcement officer’s evidence search is that it raise a “fair probability,” Gates, 462 U. S., at 238, or a “substantial chance,” id., at 244, n. 13, of discovering evidence of criminal activity. The lesser standard for school searches could as readily be described as a moderate chance of finding evidence of wrongdoing.
Ill
A
In this case, the school’s policies strictly prohibit the non-medical use, possession, or sale of any drug on school grounds, including “‘[a]ny prescription or over-the-counter drug, except those for which permission to use in school has been granted pursuant to Board policy.’ ” App. to Pet. for Cert. 128a.[1] A week before Savana was searched, another *372 student, Jordan Romero (no relation of the school’s administrative assistant), told the principal and Assistant Principal Wilson that “certain students were bringing drugs and weapons on campus,” and that he had been sick after taking some pills that “he got from a classmate.” App. 8a. On the morning of October 8, the same boy handed Wilson a white pill that he said Marissa Glines had given him. He told Wilson that students were planning to take the pills at lunch.
Wilson learned from Peggy Schwallier, the school nurse, that the pill was ibuprofen 400 mg, available only by prescription. Wilson then called Marissa out of class. Outside the classroom, Marissa’s teacher handed Wilson the day planner, found within Marissa’s reach, containing various contraband items. Wilson escorted Marissa back to his office.
In the presence of Helen Romero, Wilson requested Marissa to turn out her pockets and open her wallet. Marissa produced a blue pill, several white ones, and a razor blade. Wilson asked where the blue pill came from, and Marissa answered, “ ‘I guess it slipped in when she gave me the IBU 400s.’” Id., at 13a. When Wilson asked whom she meant, Marissa replied, “‘Savana Redding.’” Ibid. Wilson then enquired about the day planner and its contents; Marissa denied knowing anything about them. Wilson did not ask Marissa any followup questions to determine whether there was any likelihood that Savana presently had pills: neither asking when Marissa received the pills from Savana nor where Savana might be hiding them.
*373 Sehwallier did not immediately recognize the blue pill, but information provided through a poison control hotline[2] indicated that the pill was a 200-mg dose of an antiinflammatory drug, generically called naproxen, available over the counter. At Wilson’s direction, Marissa was then subjected to a search of her bra and underpants by Romero and Sehwallier, as Savana was later on. The search revealed no additional pills.
It was at this juncture that Wilson called Savana into his office and showed her the day planner. Their conversation established that Savana and Marissa were on friendly terms: while she denied knowledge of the contraband, Savana admitted that the day planner was hers and that she had lent it to Marissa. Wilson had other reports of their friendship from staff members, who had identified Savana and Marissa as part of an unusually rowdy group at the school’s opening dance in August, during which alcohol and cigarettes were found in the girls’ bathroom. Wilson had reason to connect the girls with this contraband, for Wilson knew that Jordan Romero had told the principal that before the dance, he had been at a party at Savana’s house where alcohol was served. Marissa’s statement that the pills came from Savana was thus sufficiently plausible to warrant suspicion that Savana was involved in pill distribution.
This suspicion of Wilson’s was enough to justify a search of Savana’s backpack and outer clothing.[3] If a student is *374 reasonably suspected of giving out contraband pills, she is reasonably suspected of carrying them on her person and in the carryall that has become an item of student uniform in most places today. If Wilson’s reasonable suspicion of pill distribution were not understood to support searches of outer clothes and backpack, it would not justify any search worth making. And the look into Savana’s bag, in her presence and in the relative privacy of Wilson’s office, was not excessively intrusive, any more than Romero’s subsequent search of her outer clothing.
B
Here it is that the parties part company, with Savana’s claim that extending the search at Wilson’s behest to the point of making her pull out her underwear was constitutionally unreasonable. The exact label for this final step in the intrusion is not important, though strip search is a fair way to speak of it. Romero and Schwallier directed Savana to remove her clothes down to her underwear, and then “pull out” her bra and the elastic band on her underpants. Id., at 23a. Although Romero and Schwallier stated that they did not see anything when Savana followed their instructions, App. to Pet. for Cert. 135a, we would not define strip search and its Fourth Amendment consequences in a way that would guarantee litigation about who was looking and how much was seen. The very fact of Savana’s pulling her underwear away from her body in the presence of the two officials who were able to see her necessarily exposed her breasts and pelvic area to some degree, and both subjective and reasonable societal expectations of personal privacy support the treatment of such a search as categorically distinct, requiring distinct elements of justification on the part of school authorities for going beyond a search of outer clothing and belongings.
Savana’s subjective expectation of privacy against such a search is inherent in her account of it as embarrassing, *375 frightening, and humiliating. The reasonableness of her expectation (required by the Fourth Amendment standard) is indicated by the consistent experiences of other young people similarly searched, whose adolescent vulnerability intensifies the patent intrusiveness of the exposure. See Brief for National Association of Social Workers et al. as Amici Curiae 6-14; Hyman & Perone, The Other Side of School Violence: Educator Policies and Practices that may Contribute to Student Misbehavior, 36 J. School Psychology 7, 13 (1998) (strip search can “result in serious emotional damage”). The common reaction of these adolescents simply registers the obviously different meaning of a search exposing the body from the experience of nakedness or near undress in other school circumstances. Changing for gym is getting ready for play; exposing for a search is responding to an accusation reserved for suspected wrongdoers and fairly understood as so degrading that a number of communities have decided that strip searches in schools are never reasonable and have banned them no matter what the facts may be, see, e.g., New York City Dept. of Education, Reg. No. A-432, p. 2 (2005), online at http://docs.nycenet.edu/docushare/dsweb/Get/Document-21/A-432.pdf (“Under no circumstances shall a strip-search of a student be conducted”).
The indignity of the search does not, of course, outlaw it, but it does implicate the rule of reasonableness as stated in T. L. O., that “the search as actually conducted [be] reasonably related in scope to the circumstances which justified the interference in the first place.” 469 U. S., at 341 (internal quotation marks omitted). The scope will be permissible, that is, when it is “not excessively intrusive in light of the age and sex of the student and the nature of the infraction.” Id., at 342.
Here, the content of the suspicion failed to match the degree of intrusion. Wilson knew beforehand that the pills were prescription-strength ibuprofen and over-the-counter naproxen, common pain relievers equivalent to two Advil, or *376 one Aleve.[4] He must have been aware of the nature and limited threat of the specific drugs he was searching for, and while just about anything can be taken in quantities that will do real harm, Wilson had no reason to suspect that large amounts of the drugs were being passed around, or that individual students were receiving great numbers of pills.
Nor could Wilson have suspected that Savana was hiding common painkillers in her underwear. Petitioners suggest, as a truth universally acknowledged, that “students ... hid[e] contraband in or under their clothing,” Reply Brief for Petitioners 8, and cite a smattering of eases of students with contraband in their underwear, id., at 8-9. But when the categorically extreme intrusiveness of a search down to the body of an adolescent requires some justification in suspected facts, general background possibilities fall short; a reasonable search that extensive calls for suspicion that it will pay off. But nondangerous school contraband does not raise the specter of stashes in intimate places, and there is no evidence in the record of any general practice among Safford Middle School students of hiding that sort of thing in underwear; neither Jordan nor Marissa suggested to Wilson that Savana was doing that, and the preceding search of Marissa that Wilson ordered yielded nothing. Wilson never even determined when Marissa had received the pills from Savana; if it had been a few days before, that would weigh heavily against any reasonable conclusion that Savana presently had the pills on her person, much less in her underwear.
In sum, what was missing from the suspected facts that pointed to Savana was any indication of danger to the students from the power of the drugs or their quantity, and any reason to suppose that Savana was carrying pills in her *377 underwear. We think that the combination of these deficiencies was fatal to finding the search reasonable.
In so holding, we mean to cast no ill reflection on the assistant principal, for the record raises no doubt that his motive throughout was to eliminate drugs from his school and protect students from what Jordan Romero had gone through. Parents are known to overreact to protect their children from danger, and a school official with responsibility for safety may tend to do the same. The difference is that the Fourth Amendment places limits on the official, even with the high degree of deference that courts must pay to the educator’s professional judgment.
We do mean, though, to make it clear that the T L. O. concern to limit a school search to reasonable scope requires the support of reasonable suspicion of danger or of resort to underwear for hiding evidence of wrongdoing before a search can reasonably make the quantum leap from outer clothes and backpacks to exposure of intimate parts. The meaning of such a search, and the degradation its subject may reasonably feel, place a search that intrusive in a category of its own demanding its own specific suspicions.
IV
A school official searching a student is “entitled to qualified immunity where clearly established law does not show that the search violated the Fourth Amendment.” Pearson v. Callahan, 555 U. S. 223, 243-244 (2009). To be established clearly, however, there is no need that “the very action in question [have] previously been held unlawful.” Wilson v. Layne, 526 U. S. 603, 615 (1999). The unconstitutionality of outrageous conduct obviously will be unconstitutional, this being the reason, as Judge Posner has said, that “[t]he easiest cases don’t even arise.” K. H. v. Morgan, 914 F. 2d 846, 851 (CA7 1990). But even as to action less than an outrage, “officials can still be on notice that their conduct violates es *378 tablished law ... in novel factual circumstances.” Hope v. Pelzer, 536 U. S. 730, 741 (2002).
T. L. O. directed school officials to limit the intrusiveness of a search, “in light of the age and sex of the student and the nature of the infraction,” 469 U. S., at 342, and as we have just said at some length, the intrusiveness of the strip search here cannot be seen as justifiably related to the circumstances. But we realize that the lower courts have reached divergent conclusions regarding how the T L. O. standard applies to such searches.
A number of judges have read T L. O. as the en banc minority of the Ninth Circuit did here. The Sixth Circuit upheld a strip search of a high school student for a drug, without any suspicion that drugs were hidden next to her body. Williams v. Ellington, 936 F. 2d 881, 882-883, 887 (1991). And other courts considering qualified immunity for strip searches have read T. L. O. as “a series of abstractions, on the one hand, and a declaration of seeming deference to the judgments of school officials, on the other,” Jenkins v. Talladega City Bd. of Ed., 115 F. 3d 821, 828 (CA11 1997) (en banc), which made it impossible “to establish clearly the contours of a Fourth Amendment right... [in] the wide variety of possible school settings different from those involved in T. L. O.” itself, ibid. See also Thomas v. Roberts, 323 F. 3d 950 (CA11 2003) (granting qualified immunity to a teacher and police officer who conducted a group strip search of a fifth grade class when looking for a missing $26).
We think these differences of opinion from our own are substantial enough to require immunity for the school officials in this case. We would not suggest that entitlement to qualified immunity is the guaranteed product of disuniform views of the law in the other federal, or state, courts, and the fact that a single judge, or even a group of judges, disagrees about the contours of a right does not automatically render the law unclear if we have been clear. That said, however, the cases viewing school strip searches differently *379 from the way we see them are numerous enough, with well-reasoned majority and dissenting opinions, to counsel doubt that we were sufficiently clear in the prior statement of law. We conclude that qualified immunity is warranted.
V
The strip search of Savana Redding was unreasonable and a violation of the Fourth Amendment, but petitioners Wilson, Romero, and Schwallier are nevertheless protected from liability through qualified immunity. Our conclusions here do not resolve, however, the question of the liability of petitioner Safford Unified School District #1 under Monell v. New York City Dept. of Social Servs., 436 U. S. 658, 694 (1978), a claim the Ninth Circuit did not address. The judgment of the Ninth Circuit is therefore affirmed in part and reversed in part, and this case .is remanded for consideration of the Monell claim.

It is so ordered.

 When the object of a school search is the enforcement of a school rule, a valid search assumes, of course, the rule’s legitimacy. But the legitimacy of the rule usually goes without saying as it does here. The Court said plainly in New Jersey v. T. L. O., 469 U. S. 325, 342, n. 9 (1985), that standards of conduct for schools are for school administrators to determine ■without second-guessing by courts lacking the experience to appreciate what may be needed. Except in patently arbitrary instances, Fourth *372 Amendment analysis takes the rule as a given, as it obviously should do in this ease. There is no need here either to explain the imperative of keeping drugs out of schools, or to explain the reasons for the school’s rule banning all drugs, no matter how benign, without advance permission. Teachers are not pharmacologists trained to identify pills and powders, and an effective drug ban has to be enforceable fast. The plenary ban makes sense, and there is no basis to claim that the search was unreasonable owing to some defect or shortcoming of the rule it was aimed at enforcing.

 Poison control centers across the country maintain 24-hour help hotlines to provide “immediate access to poison exposure management instructions and information on potential poisons.” American Association of Poison Control Centers, online at http://www.aapcc.org/dnn/About/ tabid/74/Default.aspx (all Internet materials as visited June 19, 2009, and available in Clerk of Court’s ease file).

 There is no question here that justification for the school officials’ search was required in accordance with the T. L. O. standard of reasonable suspicion, for it is common ground that Savana had a reasonable expectation of privacy covering the personal things she chose to carry in her backpack, cf. 469 U. S., at 339, and that Wilson’s decision to look through it was a “search” within the meaning of the Fourth Amendment.

 An Advil tablet, caplet, or gel caplet contains 200 mg ibuprofen. See 2007 Physicians’ Desk Reference for Nonprescription Drugs, Dietary Supplements, and Herbs 674 (28th ed. 2006). An Aleve caplet contains 200 mg naproxen and 20 mg sodium. See id., at 675.