BRYAN, Justice.
The State sought certiorari review of a decision of the Court of Criminal Appeals reversing the Jefferson Juvenile Court’s decision to deny G.M.’s motion to suppress evidence that G.M. argues was obtained pursuant to an illegal search. We granted certiorari review to consider as a question of first impression whether evidence of a public-school student’s association with an individual known to be involved in criminal activity and suspected of being affiliated with a gang, without more, constitutes reasonable grounds for a search of the student by a school official under the Fourth Amendment to the Constitution of the United States. We conclude that it does not. Therefore, we affirm the judgment of the Court of Criminal Appeals.

Facts and Procedural History

On the morning of December 13, 2010, E.M. met with Eddie Cunningham, an assistant principal at Homewood High School, with regard to an alleged violation of the school’s cellular-telephone policy. Cunningham searched E.M., using a metal detector, to determine whether E.M. had a cellular telephone on his person. The metal detector went off as it passed over E.M.’s back pocket, and Cunningham asked E.M. to remove the contents of that pocket. E.M. pulled out his wallet, among other things. In looking through the wallet, Cunningham discovered several small bags of what appeared to be, and subsequently turned out to be, cocaine.
After discovering the cocaine, Cunningham asked E.M. who he had been with earlier that morning and E.M. responded that he had been with his cousin, G.M. *824 E.M.’s English Language Learners (“ELL”) teacher, who had been called in to interpret for E.M. during the search,[1] told Cunningham that E.M. and G.M. had been together earlier that day and that G.M. and E.M. were “like peas [in] a pod.... [T]hey stay together.”
Cunningham then informed Dr. Kevin Maddox, the principal of Homewood High School, that E.M. had been found with what appeared to be cocaine in his wallet. Cunningham also gave Maddox G.M.’s name as someone with whom E.M. had associated earlier in the day and told him that the ELL teacher had stated that the two students were often together and that she had “concerns” about them.
Maddox summoned G.M. to his office. Maddox asked G.M. whether he had anything with him at school that day that he was not supposed to have. G.M. answered that he did not. Maddox then informed G.M. that he was going to conduct a search of his person, and he asked G.M. to empty his pockets. G.M: complied and removed his wallet, among other things, and put it on a table. Maddox found a small bag of what appeared to be cocaine inside a pocket of G.M.’s wallet.
A delinquency complaint was filed against G.M. in the juvenile court alleging unlawful possession of a controlled substance. G.M.’s parents were made parties to the case. On March 4, 2011, G.M. moved the juvenile court to suppress evidence of the cocaine found in his wallet, arguing that Maddox’s search had been conducted in violation of his rights under the Fourth and Fourteenth Amendments to the Constitution of the United States and Article I, § 5, of the Alabama Constitution of 1901. After a hearing, the juvenile court denied G.M.’s motion to suppress. G.M. pleaded true to the delinquency allegation, but he reserved the right to appeal the denial of his motion to suppress evidence of the cocaine. The juvenile court sentenced G.M. to probation.
G.M. moved the juvenile court to alter, amend, or vacate its order. The motion was denied, and G.M. appealed to the Court of Criminal Appeals. On December 14, 2012, the Court of Criminal Appeals unanimously reversed the juvenile court’s judgment and remanded the cause for further proceedings in the juvenile court. G.M. v. State, 142 So.3d 819 (Ala.Crim.App.2012). The State applied for a rehearing, which the Court of Criminal Appeals overruled on February 8, 2013. The State then petitioned for certiorari review, which we granted to consider as a question of first impression whether Maddox’s cited grounds for searching G.M. — G.M.’s association with E.M. on the morning that E.M. was found with cocaine on his person at school as well as the cousins’ suspected gang affiliation — were sufficient to justify the search.

Analysis

The Supreme Court of the United States has stated:
“[T]he legality of a search of a student should depend simply on the reasonableness, under all the circumstances, of the search. Determining the reasonableness of any search involves a twofold inquiry: first, one must consider ‘whether the ... action was justified at its inception,’ Terry v. Ohio, 392 U.S. [1], at 20 [(1968) ]; second, one must determine whether the search as actually conducted ‘was reasonably related in scope to the circumstances which justified the interference in the first place,’ ibid. Under ordinary circumstances, a search of *825 a student by a teacher or other school official will be ‘justified at its inception’ when there are reasonable grounds for suspecting that the search will turn up evidence that the student has violated or is violating either the law or the rules of the school. Such a search will be permissible in its scope when the measures adopted are reasonably related to the objectives of the search and not excessively intrusive in light of the age and sex of the student and the nature of the infraction.”
New Jersey v. T.L.O., 469 U.S. 325, 341-42, 105 S.Ct. 733, 83 L.Ed.2d 720 (1985) (emphasis added; footnotes omitted).
More recently, the Supreme Court has stated regarding school searches:
“A number of our cases on probable cause have an implicit bearing on the reliable knowledge element of reasonable suspicion, as we have attempted to flesh out the knowledge component by looking to the degree to which known facts imply prohibited conduct, the specificity of the information received, and the reliability of its source. At the end of the day, however, we have realized that these factors cannot rigidly control, and we have come back to saying that the standards are ‘fluid concepts that take their substantive content from the particular contexts’ in which they are being assessed.
“Perhaps the best that can be said generally about the required knowledge component of probable cause for a law enforcement officer’s evidence search is that it raise a ‘fair probability,’ or a ‘substantial chance,’ of discovering evidence of criminal activity. The lesser standard for school searches could as readily be described as a moderate chance of finding evidence of wrongdoing.”
Safford Unified Sch. Dist. No. 1 v. Redding, 557 U.S. 364, 370-71, 129 S.Ct. 2633, 174 L.Ed.2d 354 (2009) (emphasis added; citations omitted).
Under the standard articulated by the Supreme Court in T.L.O. and Safford, this Court must determine whether the search of G.M. was justified at its inception, or, in other words, whether the facts before Principal Maddox at the time of the search raised a reasonable suspicion of a “moderate chance of finding evidence of wrongdoing” on the part of G.M. Safford, 557 U.S. at 371. The State argues that “Maddox had strong reasons to search G.M. both as a matter of ‘reasonable suspicion’ and because of the legitimate government interest in the safety of G.M. and other students.” The State’s brief, at 19. Specifically, the State argues:
“Maddox had reasonable suspicion that G.M. was in possession of contraband. Maddox knew how close the boys were and how close in time E.M. said he and G.M. were with each other before the packets of cocaine were found on E.M. Maddox had experience and a good track record for finding additional contraband on students who had just been with a student who was caught with contraband. Maddox had long suspected E.M. and G.M. of being associated with a gang. And the ELL teacher suggested that Maddox bring in G.M. on this investigation.”
The State’s brief, at 20. The State also argues:
“[Maddox] here knew of the connection between E.M. and G.M., as the evidence indicated that these two students constantly ‘stayed together’ and were ‘two peas in a pod.’ A trained principal knows and has experience and common knowledge of how students normally act, and how they have a pattern at this age to stay together, how they might copy *826 each other’s behaviors, respond to peer pressure, and want to be part of the crowd in behavior bad or good. In this case, the record shows that [Maddox] knew that E.M. and G.M. were not only-inseparable, but in this instance G.M. was very possibly the only student who he could speak to in his native language of Spanish, he was his relative, and of the same culture, which meant that E.M. would see G.M. outside of school. [Maddox] was watching as these two came attired for school indicating that they were in the same gang, and he stated in his testimony that ‘[i]t is not difficult usually for us to establish someone’s involved in a gang.’ Finally, Maddox received information about these students from the ELL teacher who had intimate experience with these students. Maddox did not search G.M. on a ‘hunch’ or ‘mere association’; he was reasonably suspicious of G.M. under the circumstances.”
Although the State cites institutional knowledge that Maddox may have had as an administrator, Cunningham’s and Maddox’s testimony at the suppression hearing support the Court of Criminal Appeals’ characterization of the search of G.M. as being based on “a defendant’s mere association with a gang or with a known criminal.” G.M., 142 So.3d at 822. Maddox testified that he called G.M. into his office on the day of the incident based on “all the information that we had at that particular moment,” which, he acknowledged, was “[G.M. and E.M.’s] close relationship, the gang speculation and reports from the [ELL] teacher.” The ELL teacher did not testify at the suppression hearing, but Cunningham testified that the ELL teacher suggested to him that he look at G.M. because “[E.M. and G.M.] were together earlier in the day and that they’re usually like peas [in] a pod.”
With regard to the possible gang affiliation, Maddox testified that “[they] didn’t have any evidence that there was gang activity going on, but it’s not difficult usually for us to establish that someone’s involved in something like that. So, we had suspicions, but that was pretty much it.” Maddox listed indications such as students’ “actions, the way they interact with one another. The clothing they wear, just everything about them kind of gives us indications about whether they may or may not be [affiliated with a gang].” When asked for specifics regarding G.M. and E.M.’s alleged gang affiliation, however, Maddox testified: “[T]he best way I could put it would be their mannerisms when they’re together. The way they interact with one another is not typical of a student at Homewood High School.”
Cunningham testified that he gave Maddox G.M.’s name based solely on the fact that E.M. and G.M. had been together earlier in the morning on the day the search of E.M. revealed what appeared to be cocaine in his pocket and E.M. and G.M.’s close association. Maddox testified that he had “no knowledge that would have suggested that a search of [G.M.] on that day would produce cocaine” but noted that the school administration did have a “good trac[k] record” in finding additional contraband when it asked students who had been caught with contraband who they were with when they came to school on the day the contraband was discovered.
The State argues that “[t]his case is on all fours with Wynn v. Board of Education of Vestavia Hills, 508 So.2d 1170 (Ala.1987), the only Alabama precedent addressing what constitutes a reasonable search in a public school since the [United States] Supreme Court decided T.L.O.” The State’s brief, at 20. In Wynn this Court upheld a search of a student, who was one of two students left in a classroom *827 during a time in which money was allegedly stolen. This Court held:
“Hill, as classroom teacher, had reasonable grounds for suspecting that a search of two students who had been alone in the classroom would turn up evidence that one of them had taken the money. There is no evidence that any other student had been in the classroom during the time when the theft could have occurred.... Given the classroom setting and the concern of the students in Hill’s class over the missing money, we conclude that the very limited search that occurred was not excessively intrusive and was reasonably related to the objective of the search.”
508 So.2d at 1171-72.
The State argues:
“In the same way reasonable suspicion was established because Wynn was one of two students who were in proximity to the suspected contraband money shortly before the teacher knew the theft had occurred, G.M. was also identified as being in close proximity to cocaine, near E.M., shortly before Maddox knew of E.M.’s possession of the cocaine. This case is actually even stronger than the State’s case in Wynn. Here, Maddox did not need to surmise that G.M. was in proximity to E.M. and packets of cocaine, because E.M. admitted that G.M. was; in fact the record indicates that G.M. was identified as being the only one E.M. had been with when this possession crime was occurring.”
The State’s brief, at 21.
The State’s argument in this regard is disingenuous at best. In Wynn, the identity of the wrongdoer was in question, and the allegedly violative search was narrowed to the two students who were present in the classroom when the alleged wrongdoing occurred. Here, however, the decision to search G.M. was based not on his proximity to a wrongdoing where the identity for the wrongdoer was unknown; the cocaine was found in E.M.’s possession. Instead, the search was based on his association with and proximity to E.M., the wrongdoer. Wynn does not address whether proximity to a wrongdoer constitutes reasonable grounds for a search. Therefore, it is distinguishable and does not support the State’s argument here.
The State also argues that “[t]he facts of this case are similar to cases in which courts have invoked the ‘moderate chance’ standard to conclude that school searches are constitutional.” The State’s brief, at 23-24. The State cites Lausin v. Bishko, 727 F.Supp.2d 610 (N.D.Ohio 2010), and M.C. v. Sigal, (No. 3:09-cv-1437) (D.Conn. August 4, 2010) (not reported in F.Supp.2d), in support of that argument.
However, neither Lausin or M.C. involves a circumstance in which the search of a student’s property or person was based on a student’s association with a known wrongdoer or on the student’s suspected affiliation with a gang. In Lausin, the student was seen entering a restroom shortly before a message threatening African-American students was found written on the restroom wall, and the school official had knowledge of previous complaints and comments made by the student against African-American students. 727 F.Supp.2d at 619-20. In M.C., the search of the juvenile defendant was precipitated by his refusal to unclench his buttocks, during a patdown search at a juvenile detention center. The alleged grounds for the searches in Lausin and M.C. were based on knowledge of the student’s own conduct or beliefs and proximity to the suspected wrongdoing. These cases, like Wynn, are distinguishable and fail to support the State’s arguments in this case.
*828 G.M. cites three cases from Florida appellate courts in which, he argues, those courts “have held student searches unlawful in circumstances ... more analogous to the instant case,” G.M.’s brief, at 20: R.J.M. v. State, 456 So.2d 584 (Fla.Dist.Ct.App.1984); M.S. v. State, 808 So.2d 1263 (Fla.Dist.Ct.App.2002); and C.A. v. State, 977 So.2d 684 (Fla.Dist.Ct.App.2008). In each of those cases, the appellate court found the student’s association with or proximity to other students who were either suspected of or known to be involved in wrongdoing insufficient to establish reasonable suspicion justifying a search of the student.
In R.J.M., the Florida District Court concluded that the school official who had searched R.J.M. “[biased solely on the fact that R.J.M. was the friend of a female student who had, reportedly because of drugs, fainted at the public high school they both attended,” 456 So.2d at 584, “did not have anything remotely resembling the reasonable suspicion of R.J.M.’s wrongdoing which is required to justify a search of a student by a school official.” 456 So.2d at 585. In M.S., the Florida District Court stated: “Though school officials may have had reasonable suspicion that the other student [with whom M.S. had been seen earlier in the day] was ‘Smokin’ in the Boys’ Room,’ their suspicion as to the other boy could not be transferred to M.S.” 808 So.2d at 1265 (footnote omitted). In C.A., the Florida District Court held that C-A.’s conversation with another student, who was found to smell strongly of marijuana, was not reasonable grounds for searching C.A. because “suspicion by association or transference is not ‘reasonable suspicion.’ ” 977 So.2d at 686. The court in C.A. also stated that “[although a ‘hunch’ or an ‘intuition’ may in some instances disclose wrongdoing, these more ephemeral precursors to questioning are insufficient as a matter of law.” Id.
We agree with G.M. that the cited cases from the Florida District Courts of Appeal are more analogous to this case and offer a sound rationale that can be applied here. In another context, the United States Supreme Court has stated that “a person’s mere propinquity to others independently suspected of criminal activity does not, without more, give rise to probable cause to search that person.” Ybarra v. Illinois, 444 U.S. 85, 90, 100 S.Ct. 338, 62 L.Ed.2d 238 (1979). Although we recognize that the standard of suspicion is lower for searches conducted in a public-school setting, we do not believe that it is so low as to allow searches based solely on a student’s association with a known wrongdoer or general speculation as to the student’s possible gang affiliation.
The United States Supreme Court has stated:
“[T]his Court has previously held that ‘special needs’ inhere in the public school context. While schoolchildren do not shed their constitutional rights when they enter the schoolhouse, ‘Fourth Amendment rights ... are different in public schools than elsewhere; the “reasonableness” inquiry cannot disregard the schools’ custodial and tutelary responsibility for children.’ ”
Board of Educ. of Indep. Sch. Dist. No. 92 of Pottawatomie Cnty. v. Earls, 536 U.S. 822, 829-30, 122 S.Ct. 2559, 153 L.Ed.2d 735 (2002) (quoting Vernonia Sch. Dist. 47J v. Acton, 515 U.S. 646, 656, 115 S.Ct. 2386, 132 L.Ed.2d 564 (1995) (citations omitted)). However, we cannot agree with the State that Principal Maddox’s search in this case was based on a reasonable suspicion that there was a moderate chance of finding evidence of wrongdoing by G.M.
The State argues that “the weight of legitimate governmental interests is neces *829 sarily a consideration in an evaluation of virtually any reasonable search,” the State’s brief, at 26, and that the .governmental interest at issue in this case was compelling. However, none of the cases cited by the State indicates that a legitimate government interest, even a compelling one, will justify a search of a student based solely on the student’s association with a known wrongdoer. The Supreme Court in T.L.O. emphasized the need to “strike the balance between the schoolchild’s legitimate expectations of privacy and the school’s equally legitimate need to maintain an environment where learning can take place.” 469 U.S. at 340. Permitting searches of public-school students based solely on their association with other wrongdoers would effectively negate the students’ rights under the Fourth Amendment. We are unwilling to set such a standard.
That said, however, like the Supreme Court in Safford,
“we mean to cast no ill reflection on [Principal Maddox], for the record raises no doubt that his motive throughout was to eliminate drugs from his school.... Parents are known to overreact to protect their children from danger, and a school official with responsibility for safety may tend to do the same. The difference is that the Fourth Amendment places limits on the official, even with the high degree of deference that courts must pay to the educator’s professional judgment.”
557 U.S. at 377.
The search of G.M. by Principal Maddox, however well intentioned, was predicated solely upon G.M.’s association with E.M. and upon Maddox’s speculations as to G.M.’s and E.M.’s possible gang affiliation and, therefore, was not based on reasonable suspicion or justified at its inception.[2] Under the standard set out in T.L.O., the search violated G.M.’s Fourth Amendment rights, and he was entitled to have the evidence obtained during that search suppressed.

Conclusion

In light of the foregoing, we agree with the Court of Criminal Appeals that the juvenile court erred by denying G.M.’s motion to suppress evidence of the cocaine found in his wallet, and the Court of Crimi- . nal Appeals properly reversed the juvenile court’s judgment. We, therefore, affirm the judgment of the Court of Criminal Appeals.
AFFIRMED.
STUART, BOLIN, PARKER, MAIN, and WISE, JJ., concur.
MOORE, C.J., concurs specially.
MURDOCK and SHAW, JJ., dissent.

. E.M. and G.M. speak Spanish as their primary language.

. Our decision in this regard pretermits consideration of the State’s arguments as to the relative intrusiveness of the search.