NOT RECOMMENDED FOR PUBLICATION
File Name: 15a0627n.06

No. 14-1571

FILED
Sep 09, 2015
DEBORAH S. HUNT, Clerk

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT |
| PAUL WILLIAM HILTON, | ) | COURT FOR THE EASTERN |
| | ) | DISTRICT OF MICHIGAN |
| Defendant-Appellant. | ) | |
| | ) | |
| | ) | |

BEFORE:    SUHRHEINRICH, BATCHELDER, and CLAY, Circuit Judges

**ALICE M. BATCHELDER, Circuit Judge.**  Paul Hilton appeals the judgment entered following his plea of guilty to two counts of conspiracy to produce child pornography.  He challenges specifically the district court's denial of two different motions to suppress which claimed violations of his Fourth and Fifth Amendment rights.  Finding no error in the district court's determination, we AFFIRM.

**I.**

In 2002, Paul Hilton was convicted in the District Court for the Eastern District of Missouri of distribution and transportation of child pornography.  [R. 108 at 653]  He was sentenced to sixty months' imprisonment followed by three years of supervised release.  [*Id.*] His initial supervised release commenced on April 1, 2006.  [*Id.*]  In November 2007, the court revoked his supervised release because his probation officer discovered that Hilton had not

disclosed that he was in a relationship with a 23-year-old female who had a 2-year-old son and that he attended sporting events where minor children were present, both of which violated his supervised release conditions. [*Id.* at 654] For these violations, he was sentenced to six months imprisonment followed by thirty months of supervised release. [*Id.* at 656]

Hilton's supervised release through the Eastern District of Missouri was contingent on his following several standard conditions, such as the requirement that he "answer truthfully all inquiries by the probation officer." [R. 92-3 at 483] He was also subject to additional supervised release terms because of his sex offender status. These included not possessing obscene material, not subscribing to Internet services without the permission of his probation officer, not possessing or using a device with Internet capability or audio or visual recording equipment without permission of his probation officer, and not possessing or using a computer without permission. [*Id.* at 484] He also had to "submit his person, residence, office, computer, or vehicle to a search, conducted by a United States Probation Officer at a reasonable time and in a reasonable manner, based upon reasonable suspicion of contraband or evidence of a violation of a condition of release." [*Id.*]

During Hilton's second supervised release, United States Probation Officer Clinton Vestal supervised him. [R. 108 at 652] He visited Hilton twice a month, appearing unannounced and at random times at the residence where Hilton lived with his sister. [*Id.* at 662] In May 2010, Vestal, through the local sheriff's office, was informed of an email concerning Hilton from a tipster named Keith. [*Id.* at 671, 674] The email relayed several "known parole violations" including that Hilton had a profile on the social network Mocospace. [R. 96-2 at 560] The email also provided a link to the Mocospace profile. [*Id.*]

Vestal checked the Mocospace profile to which Keith had provided a link. [R. 108 at 731] The link led to a profile page for "fat.naked.santa," a 49-year-old male. [*Id.* at 681-82] Vestal recognized the person in the profile picture on the page—an apparently naked man taking a selfie in a mirror while wearing a Santa hat—to be Paul Hilton. [*Id.* at 679] Vestal determined that it was a recent picture because he recognized the room in which it was taken as a room in Hilton's sister's house—where Hilton had been living only since his release—and the picture featured a heftier Hilton, consistent with his recent weight gain. [*Id.* at 687] The profile further described the user's desires: "Abusing naughty little girls and corrupting the nice ones. Hey moms, bring your little ones to Santa's naughty playhouse and watch them suck this rock hard pole." [*Id.* at 685] Vestal recognized this description as consistent with Hilton's desire to sexually abuse children. [*Id.* at 685-86] He also recognized the profile name as similar to other profile names Hilton had used in the past, including Fat Ugly Daddy, Fat Naked Daddy, and Fat Hairy Daddy. [*Id.* at 737]

After looking at the profile page, Vestal believed that Hilton had violated several conditions of his supervised release, including his having a camera phone without authorization and his having a social media profile without permission. [*Id.* at 680, 688] Believing that he had reasonable suspicion, Vestal coordinated a search of Hilton's residence with the probation search team and members of the local sheriff's department. [*Id.* at 696] Upon arriving at Hilton's residence, Vestal put Hilton in handcuffs and belly chains and escorted him into a police vehicle. [*Id.* at 727-28]

Vestal sat with Hilton in the police vehicle for "a while." [*Id.* at 728] Without giving Hilton *Miranda* warnings, Vestal began asking Hilton questions. [*Id.*] During this conversation, Hilton admitted to possessing child pornography on a Blackberry device. [Sealed Appendix at

12]  He further stated that he had profiles on Mocospace and Mbuzzy, another social media platform.  [*Id.*]  He admitted that while using the Internet, he met a 22-year-old female named Nichole who lives in Detroit, Michigan.  [*Id.*]  Nichole opened the social media accounts for him and sent him the Blackberry at his request.  [*Id.*]  At some point during the conversation, Vestal advised the other officers—who were still conducting the search—about the Blackberry, but he could not remember if he did so before or after they had already found it.  [R. 108 at 729]  Either way, the officers found the Blackberry in a kitchen drawer in the home.  [Sealed Appendix at 12]

On May 25, 2010, the District Court for the Eastern District of Missouri sentenced Hilton to ten months imprisonment followed by forty months supervised release for violating several conditions of his previous supervised release.  [Sealed Appendix at 44-47]  That same day, Special Officer Todd Roth of the Federal Bureau of Investigation ("FBI"), pursuant to an investigation concerning possible crimes committed through Hilton's usage of the Internet during his supervised release, obtained a warrant for the contents of the Blackberry.  [*Id.* at 5]  The warrant was predicated mostly on Keith's tip and Hilton's statements to Vestal.  [*Id.* at 11-13]  During the execution of the warrant, the FBI found many images and movies of child pornography on Hilton's phone.  [R. 92-6 at 498]  It also found text message conversations between Hilton and Nichole about exchanging images of child pornography, training children for sex, and abducting children from school.  [R. 92-7 at 500]

On November 3, 2010, during the FBI's investigation, Special Agent David Martin of the FBI and another individual went to interview Hilton while Hilton was in prison.  They told him that Vestal had informed them of the statements Hilton had made on the day of his revocation arrest and said that they hoped that Hilton would be as honest and forthcoming with them.  [*Id.* at 501-02]  They then read Hilton his *Miranda* rights and Hilton waived them.  [*Id.* at 502]  Hilton

then provided significant information that was used against him in his indictment. Then, in December 2010, Special Agent Martin obtained warrants for the contents of various phone and email accounts hosted by Sprint, Yahoo, and Google. [Sealed Appendix at 55-89] The warrants turned up thousands of email communications between Hilton and Nichole that also formed the basis of many counts in the indictment.

In 2012, a federal grand jury in the Eastern District of Michigan charged Hilton with twenty-four counts related to production, transfer, receipt, and transportation of child pornography, as well as the commission of a felony involving a minor when required to register as a sex offender. [R. 64] During the course of the proceedings, Hilton filed two relevant motions to suppress. First, he filed a motion to suppress the Blackberry phone for lack of reasonable suspicion during the warrantless search. [R. 92] Second, he filed a motion to suppress the evidence on the Blackberry, the information in the Sprint, Yahoo, and Google accounts, and the November confession as fruits of his unwarned statements during the initial search. [R. 113] The district court denied both motions. Hilton then entered a guilty plea for two counts of conspiracy to produce child pornography, reserving his right to appeal the two aforementioned motions to suppress. [R. 130 at 893, 896] The district court sentenced him to forty years imprisonment followed by supervised release for the rest of his life. [*Id.* at 976-77] Hilton timely appealed.

## II.

"When reviewing a district court's decision on a motion to suppress, we use a mixed standard of review: we review findings of fact for clear error and conclusions of law de novo." *United States v. Pritchett*, 749 F.3d 417, 435 (6th Cir. 2014) (internal quotation marks omitted). "When a district court has denied a motion to suppress, this Court reviews the evidence in the

light most likely to support the district court's decision." *Id.* (internal quotation marks omitted). "A factual finding is clearly erroneous only where, considering all of the evidence, the court is left with the definite and firm conviction that a mistake has been committed." *Id.* at 435–36 (internal quotation marks omitted).

## III.

Hilton's first motion to suppress concerned the Blackberry phone and Hilton's claim that Vestal had lacked reasonable suspicion to conduct the warrantless search of his residence. As mentioned, one of Hilton's supervised release terms stipulated that he "shall submit his person, residence, office, computer, or vehicle to a search, conducted by a United States Probation Officer at a reasonable time and in a reasonable manner, based upon reasonable suspicion of contraband or evidence of a violation of a condition of release." [R. 92-3 at 484] "Reasonable suspicion is based on the totality of the circumstances and has been defined as requiring 'articulable reasons' and 'a particularized and objective basis for suspecting the particular person . . . of criminal activity.'" *Northrop v. Trippet*, 265 F.3d 372, 381 (6th Cir. 2001) (quoting *United States v. Cortez*, 449 U.S. 411, 417–18 (1981)). "An officer must be able to point to specific and articulable facts, together with rational inferences drawn from those facts, that reasonably suggest criminal activity has occurred or is imminent." *Id.* For the purposes of the Fourth Amendment, an individual's violating the terms of his supervised release is comparable to his violating a criminal statute. *See United States v. Herndon*, 501 F.3d 683, 689 (6th Cir. 2007). Thus, for constitutional purposes, a search based on reasonable suspicion can be used to seek evidence of either a violation of a criminal statute or a supervised release violation. *Id.* at 689– 90.

Although Hilton spills much ink attempting to undermine Keith's tip, his attempt misses the mark because Vestal's reasonable suspicion does not depend on the tip. After following the link to the profile purporting to belong to Hilton, Vestal had reasonable suspicion to believe that Hilton had violated his supervised release by having the profile at all, which would have entailed using a computer or other Internet-ready device without Vestal's permission. Hilton counters that someone else could have created the profile, but his "attempts to second-guess the officer's reasonable suspicion" are unavailing because "reasonable suspicion need not rule out the possibility of innocent conduct." *Navarette v. California*, 134 S. Ct. 1683, 1691 (2014) (internal quotation marks omitted). Reasonable suspicion requires only "a moderate chance of finding evidence of wrongdoing." *Safford Unified Sch. Dist. No. 1 v. Redding*, 557 U.S. 364, 371 (2009).

Moreover, even if someone else had created the profile, Vestal still had reasonable suspicion of Hilton's violating his supervised release conditions. When viewing the profile, Vestal saw that it contained a picture of Hilton holding a camera phone. Vestal recognized the photo as a recent one because it was taken in the living room of Hilton's current residence and featured Hilton's weight gain which had only occurred after his release from prison. Using or possessing a camera phone without permission violated Hilton's supervised release in and of itself. This picture gave Vestal the requisite reasonable suspicion to search Hilton's residence pursuant to the conditions of his supervised release. The district court thus did not err by denying Hilton's motion to suppress the Blackberry.

## IV.

Hilton's second motion to suppress was directed at the evidence on the Blackberry, the information found in the Sprint, Yahoo, and Google accounts, and the November confession as

fruits of his unwarned statements during the initial search. The government conceded that Vestal did not give *Miranda* warnings to Hilton and so declared that it would not use Hilton's statements, made during a custodial interrogation, in its case-in-chief. [*See* R. 108 at 632] In this way, the government complied with *United States v. Patane*, 542 U.S. 630 (2004), which held that "police do not violate a suspect's constitutional rights (or the *Miranda* rule) by negligent or even deliberate failures to provide the suspect with the full panoply of warnings prescribed by *Miranda*"; rather, "[p]otential violations occur, if at all, only upon the admission of unwarned statements into evidence at trial." *Id.* at 641. Thus, "with respect to mere failures to warn" there is "nothing to deter," and so there is "no reason to apply the 'fruit of the poisonous tree' doctrine." *Id.* at 642.

The Supreme Court does, however, require exclusion of fruit of "actually coerced statements." *Id.* at 644. For this reason, Hilton puts forth two arguments as to why his statements to Vestal were "actually" coerced: (1) Vestal's interview tactics were coercive, and (2) Hilton's release term—which required him to "answer truthfully all inquiries by the probation officer"—was inherently coercive. As for the interview tactics argument, Hilton has waived it by failing to raise it before the district court. *Scottsdale Ins. Co. v. Flowers*, 513 F.3d 546, 552 (6th Cir. 2008). And even assuming the release term were inherently coercive, Hilton has still not shown a violation of his Fifth Amendment rights because none of the evidence was actually fruit of the unwarned statements.

**A.**

Vestal cannot remember whether he told the officers conducting the search about the Blackberry before or after they had already found it. In either event, the phone was not a fruit of the unwarned statements because of its inevitable discovery. The inevitable discovery exception

to the exclusionary rule applies when "the government can demonstrate *either* the existence of an independent, untainted investigation that inevitably would have uncovered the same evidence *or* other compelling facts establishing that the disputed evidence inevitably would have been discovered." *United States v. Kennedy*, 61 F.3d 494, 499 (6th Cir. 1995) (emphasis in original). "The government can satisfy its burden by showing that routine procedures that police would have used regardless of the illegal search would have resulted in the discovery of the disputed evidence." *United States v. Ford*, 184 F.3d 566, 577 (6th Cir. 1999). Although first applied in the Fourth Amendment context, the inevitable discovery doctrine applies with equal force to potential Fifth Amendment violations. *Cf. United States v. Hodge*, 714 F.3d 380, 387 (6th Cir. 2013).

Here, the government has satisfied its burden because it can show that Vestal, pursuant to the supervised release term authorizing him to search Hilton's residence based upon reasonable suspicion, would have discovered the Blackberry regardless of any unwarned statements. Even though the phone was found in a kitchen drawer, "[a] lawful search of fixed premises generally extends to the entire area in which the object of the search may be found and is not limited by the possibility that separate acts of entry or opening may be required to complete the search." *United States v. Ross*, 456 U.S. 798, 820–21 (1982). The object of Vestal's search was the Blackberry phone because that is the phone he had seen Hilton holding in the selfie on the Mocospace page. Because Vestal would have inevitably discovered the Blackberry even without Hilton's statements, the phone was not fruit of the unwarned statements.

Hilton contends that even if the seizure of the Blackberry itself were inevitable, the recent Supreme Court case *Riley v. California*, 134 S. Ct. 2473 (2014), would protect the information on the cell phone. The Court in *Riley*, however, stated specifically that its holding "is not that

the information on a cell phone is immune from search; it is instead that a warrant is generally required before such a search." *Id.* at 2493. Even if Vestal had not obtained a warrant prior to searching the phone, however, *Riley* contemplates that "other case-specific exceptions may still justify a warrantless search of a particular phone." *Id.* at 2494. Hilton's supervised release terms surely provide one of these exceptions. These terms stipulated that Hilton would submit any computer to a search based upon reasonable suspicion. [R. 92-3 at 484] This search "may include retrieval and copying of all data from the defendant's computer(s)." [*Id.*] Although the object of the search was a Blackberry cell phone, "a modern cell phone *is* a computer." *United States v. Flores-Lopez*, 670 F.3d 803, 804 (7th Cir. 2012); *see also Riley*, 134 S. Ct. at 2489 ("The term 'cell phone' is itself misleading shorthand; many of these devices are in fact minicomputers that also happen to have the capacity to be used as a telephone."). Because Vestal's search based on reasonable suspicion would have inevitably found the Blackberry and also would have allowed him to retrieve and copy all data from the phone, there is no Fifth Amendment violation, and the district court did not err in denying suppression of the contents of the Blackberry.

**B.**

Whereas the warrant for the contents of the Blackberry was premised largely on Hilton's statements and thus might have created a Fifth Amendment violation but for the inevitable discovery doctrine, the warrants for the Sprint, Yahoo, and Google accounts barely mentioned the unwarned statements. In each warrant, the statement of facts featured twenty-one paragraphs, only one of which detailed Hilton's statements during the search. It is well-settled that "when a search warrant is based partially on tainted evidence and partially on evidence arising from independent sources, if the lawfully obtained information . . . would have justified

issuance of the warrant apart from the tainted information, the evidence seized pursuant to the warrant is admitted." *United States v. Jenkins*, 396 F.3d 751, 760 (6th Cir. 2005) (citation omitted). The warrants for the accounts focused almost exclusively on the information found on the Blackberry. As shown, this cell phone data was not fruit of the unwarned statements and was lawfully obtained pursuant to Hilton's supervised release conditions. Because this lawfully obtained information would have justified issuance of the warrant apart from the paragraph about the unwarned statements, the information in the Sprint, Yahoo, and Google accounts is not fruit of the statements.

## C.

Hilton finally contends that his statements in November 2010 to Special Agent David Martin were fruit of his unwarned statements to Vestal in May 2010. These second statements, however, were sufficiently attenuated from the unwarned statements, even assuming the latter statements were coerced. Under Supreme Court precedent, "when a prior statement is coerced, the time that passes between confessions, the change in the locations of the interrogations, and the change in the identities of interrogators all bear on whether coercion has carried over into the second confession." *United States v. Crowder*, 62 F.3d 782, 786 n.1 (6th Cir. 1995) (citing *Oregon v. Elstad*, 470 U.S. 298, 310 (1985)). In *Crowder*, we found admissible a confession that occurred ten days after the unwarned statements, took place in a different location, and involved a different interrogator. *Id.*; *see also United States v. Daniel*, 932 F.2d 517 (6th Cir. 1991) (finding admissible a confession that occurred one day after an unwarned statement and involved a different interrogator). Here, Hilton's *Mirandized* statements in November 2010 occurred six months after the unwarned statements, took place in a different location (prison as opposed to outside his residence), and involved a different interrogator (Martin as opposed to Vestal). The

November 2010 confession was sufficiently attenuated from the unwarned statements that the district court did not err in denying suppression of the confession.

**V.**

For the foregoing reasons, we AFFIRM the district court's denial of the two motions to suppress.