[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 14-14960
_____

D.C. Docket No. 1:12-cv-00478-AT


D. H.,
a minor by his mother, Angela Dawson,

Plaintiff-Appellee,

versus

CLAYTON COUNTY SCHOOL DISTRICT, et al.,

Defendants,

TYRUS MCDOWELL,
former Eddie White Academy
Assistant Principal; individually,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Northern District of Georgia
_____

(July 29, 2016)

Before HULL and WILSON, Circuit Judges, and MARTINEZ,[*] District Judge.

HULL, Circuit Judge:

In this 42 U.S.C. § 1983 action, Defendant Tyrus McDowell appeals the district court's interlocutory order denying his motion for summary judgment based on qualified immunity.   The district court found that Assistant Principal McDowell's strip search of a minor student violated clearly established constitutional law.  After careful review of the record and briefs, and with the benefit of oral argument, we affirm in part and reverse in part the district court's September 30, 2014 order and remand to the district court for a trial.

## I.    PROCEDURAL HISTORY

On February 8, 2011, Defendant McDowell was an Assistant Principal at Eddie White Academy ("EWA"), a public K-8 school.  Plaintiff D.H. was a 12-year-old 7th grader.  Based upon reports and his individualized suspicion that D.H. possessed marijuana at school, Assistant Principal McDowell, in an office, performed a strip search of D.H.

On December 24, 2012, Angela Dawson, on behalf of her minor son D.H., filed an amended complaint ("the complaint") in federal district court under 42 U.S.C. § 1983 against not only Defendant McDowell, but also Defendants Kemuel Kimbrough, as former chief of the Clayton County Sheriff's Office, Ricky

_____

[*]Honorable Jose E. Martinez, United States District Judge for the Southern District of Florida, sitting by designation.

2

Redding, an EWA school resource officer present during the strip search of D.H., and the Clayton County School District ("the School District"). The complaint alleged that the defendants deprived D.H. of his rights to privacy, to be secure in his person, and to be free from unreasonable searches and seizures as protected by the Fourth and Fourteenth Amendments of the United States Constitution and the Georgia Constitution, Art. I, Sec. I, Par. I, XIII, XVII. The complaint asserted causes of action under federal and state law.

In a March 22, 2013 order, the district court dismissed without prejudice D.H.'s federal § 1983 claims against Kimbrough and dismissed with prejudice D.H.'s state claims against Kimbrough. In a December 18, 2013 order, the district court approved a joint settlement between D.H. and Redding. This left the School District and McDowell as the only remaining defendants in the action.

On November 8, 2013, Assistant Principal McDowell filed a motion for summary judgment asserting that he was entitled to qualified immunity with respect to D.H.'s federal § 1983 claims, and official immunity with respect to D.H.'s state claims. That same day, the School District filed a motion for summary judgment on the grounds that it could not be held liable for McDowell's strip search. Also that same day, D.H. filed cross-motions for summary judgment against McDowell and the School District.

3

In a September 30, 2014 order, the district court granted the School District's motion for summary judgment and denied D.H.'s cross-motion for summary judgment against the School District. As to McDowell, however, the district court (1) denied McDowell's motion for summary judgment as to his request for qualified immunity from D.H.'s federal § 1983 claims, (2) granted McDowell's motion for summary judgment as to his request for official immunity from D.H.'s state claims, and (3) granted in part D.H.'s cross-motion for summary judgment against McDowell, concluding that McDowell had violated D.H.'s constitutional rights and was liable under § 1983. After the district court's September 30, 2014 order, the sole remaining issue for trial was what damages Assistant Principal McDowell owed D.H. with respect to D.H.'s federal § 1983 claims. [1]

On October 23, 2014, McDowell filed a notice of interlocutory appeal from the district court's September 30, 2014 order. [2] Our discussion below primarily concerns our review of McDowell's motion for summary judgment based on qualified immunity. As such, we recount the relevant facts in the light most

[1]The issues of the School District's liability and McDowell's official immunity defense are not before us on appeal and, therefore, we do not address them.

[2]A district court's order denying a defendant's motion for summary judgment based on qualified immunity is an immediately appealable order when, as here, the order implicates disputed issues of law. See Cottrell v. Caldwell, 85 F.3d 1480, 1485 (11th Cir. 1996). Accordingly, D.H.'s motion to dismiss this appeal for lack of jurisdiction is denied. This Court reviews a district court's order denying qualified immunity de novo. Lee v. Ferraro, 284 F.3d 1188, 1190 (11th Cir. 2002).

favorable to D.H., the non-moving party.  See Lee v. Ferraro, 284 F.3d 1188, 1190 (11th Cir. 2002).

## II.    FACTS

On the morning of February 8, 2011, a student informed Deputy Ricky Redding, a school resource officer at EWA, that D.V., a 13-year-old EWA student in the 7th grade, possessed marijuana and was passing it around to other students. Deputy Redding relayed this information to Sheneaise Ratcliff, an Assistant Principal at EWA.  D.V. had been suspected of bringing drugs and weapons to school on several prior occasions.  Additionally, marijuana had been found on another EWA student on a previous occasion.  According to Assistant Principal Ratcliff, the presence of marijuana in an elementary school is a "very serious problem."

## A.    D.V. Says He Has No Marijuana

Assistant Principal Ratcliff retrieved D.V. from class, brought him to her office, and searched his book bag.  At that time, Ratcliff did not find any drugs in D.V.'s book bag.  Ratcliff did not ask D.V. to remove his clothing.  D.V. insisted that he had no drugs.  D.V. stated that his 14-year-old 7th grade classmate, R.C., was the one with marijuana that day.  As discussed infra, it turns out marijuana was found in D.V.'s backpack a short time later that day.

**B.    R.C. Says He Has No Marijuana**

In response to D.V.'s implication of R.C., Assistant Principal Ratcliff moved D.V. to a front office, retrieved R.C., and brought R.C. to Deputy Redding's office. Assistant Principal Ratcliff searched R.C.'s backpack in front of Deputy Redding. Though visibly nervous, R.C. denied having any drugs, and Ratcliff did not find any drugs in R.C.'s backpack. Ratcliff did not ask R.C. to remove his clothing. R.C. stated that his twelve-year-old 7th grade classmate, T.D., possessed marijuana.

**C.    T.D. Has Marijuana in his Underpants**

In response to R.C.'s implication of T.D., Assistant Principal Ratcliff retrieved T.D. from class and brought him to Deputy Redding's office, where Deputy Redding and R.C. remained present. Deputy Redding said, "[y]ou know what we're looking for so you might as well just give it to us." In response, T.D. voluntarily unbuttoned his pants, faced away from Ratcliff, and pulled a small plastic bag containing marijuana out of what appeared to be his underpants.[3]

Assistant Principal Ratcliff had previously received training that warned her of the possibility that students may hide drugs in their clothing. Nevertheless, Ratcliff was surprised by T.D.'s actions, as she had never witnessed a student pull marijuana out of his or her underpants.

---

[3]Despite the voluntary unbuttoning of his pants, T.D. was never asked to remove his clothing.

T.D. appeared to be embarrassed about unbuttoning his pants in front of Ratcliff, a female.  Therefore, Ratcliff phoned McDowell, a male Assistant Principal at ECW, and asked him to assist with further searching.  McDowell had never been involved in a search where a student had hidden marijuana in his underpants and found the situation "unusual."

On the phone, Ratcliff informed McDowell of the events that had transpired that morning.  Ratcliff testified that she informed McDowell that a student had "pulled out drugs from what appeared to be his underwear."  McDowell misunderstood Ratcliff, however, and mistakenly believed that two students had been found with marijuana in their underpants.

At his deposition, McDowell testified that Ratcliff told him that marijuana was found "in the underwear" of one or two students.  In his Responses to Plaintiff's Interrogatories, McDowell indicated that it was his "understanding that marijuana had already been found in the waistband of the underwear of one or both students who had already been searched."  In the light most favorable to D.H., we must view McDowell as having understood that marijuana had been found in the waistband of the underwear of one or two students.

## D.    R.C. Has Marijuana in his Sock

After phoning Assistant Principal McDowell, Assistant Principal Ratcliff returned to Deputy Redding's office.  Deputy Redding informed Ratcliff that,

7

while she was gone, he found two "blunts" and a small bag of marijuana in R.C.'s sock. As of this point in time, in Deputy Redding's office, T.D. had produced marijuana from his underpants and Deputy Redding had found marijuana in R.C.'s sock.

In response to Assistant Principal Ratcliff's call, Assistant Principal McDowell briefly visited Deputy Redding's office and saw R.C. and T.D. in handcuffs. McDowell then went to the bookkeeper's office and found Ratcliff and EWA's principal talking to D.V. McDowell believed that he should further search D.V. with Deputy Redding present. Therefore, McDowell brought D.V. to Deputy Redding's office, where Deputy Redding, T.D., and R.C. were present.

## E.    D.V. Has Marijuana in his Backpack

At McDowell and Deputy Redding's direction, D.V. removed his shoes and socks, removed his polo shirt, turned his pockets inside-out, and pulled down his pants. At that point, D.V. was standing in an undershirt and basketball shorts. McDowell instructed D.V. to pull down his shorts and pull the elastic band of his underpants away from his person, which D.V. did, briefly exposing his genitals to McDowell. McDowell found no drugs on D.V.'s person.

However, McDowell performed another search of D.V.'s backpack and found a small mint canister containing marijuana. After McDowell discovered marijuana in D.V.'s backpack, D.V. stated that D.H., his 7th grade classmate, was

8

another student with marijuana.[4]   R.C., however, stated that he knew "for a fact" that D.H. did not have any marijuana.  D.H. had never previously been suspected of bringing drugs to school.

At this juncture, McDowell knew that three students were found with marijuana: T.D., R.C., and D.V.  Additionally, D.V. had told McDowell that D.H. had marijuana too.

## F.    Search of D.H. in Detail

The specific details of the search of D.H. are important to our analysis in this case.

In response to D.V.'s implication of D.H., Deputy Redding and McDowell told Ratcliff to retrieve D.H. and bring him to Deputy Redding's office.  Ratcliff retrieved D.H. from class, dropped him off at Deputy Redding's office, and left. D.H. was unaware that marijuana had been found on his three other classmates, and did not know why he was brought to Deputy Redding's office.

At this point, the following individuals were in Deputy Redding's office: Assistant Principal McDowell, Deputy Redding, D.H., R.C., T.D., and D.V. Deputy Redding was at his desk, D.V. was sitting on the floor, and T.D. and R.C. were sitting in chairs.  McDowell was standing near D.H.

---

[4]Assistant Principal Ratcliff testified that T.D. had told her that D.H. had marijuana.  T.D. testified that he told Ratcliff no such thing.  The parties dispute whether Ratcliff informed McDowell that T.D. implicated D.H.  In the light most favorable to D.H., we assume that D.V. was the only person who told McDowell that D.H. had marijuana.

Deputy Redding asked D.H. if he had any drugs and D.H. replied that he did not. McDowell then informed D.H. that he would have to search him for drugs. First, McDowell instructed D.H. to empty the contents of his backpack, which he did. McDowell combed the contents of the backpack but found no drugs.

Next, McDowell instructed D.H. to take off his shoes, empty his pockets, and take off his pants, which D.H. did. D.H. was wearing boxer short underpants, which had an elastic waistband and were loose on the thighs. As D.H. was standing in his underpants, R.C. told McDowell that D.H. didn't have any drugs. Deputy Redding asked R.C. why he did not say anything earlier, and R.C. replied that he had previously told McDowell that D.H. didn't have any drugs. After Deputy Redding's brief exchange with R.C., McDowell instructed D.H. to remove his socks and shirt, which D.H. did.

Next, according to D.H., McDowell instructed D.H. to remove his underwear. D.H. asked McDowell to continue the search in the restroom, but McDowell refused. McDowell stated that he had to perform the search in front of Deputy Redding. D.H. testified that he pulled his underwear down to his ankles and stood up, leaving his underpants resting at his ankles. McDowell testified that he only instructed D.H. to pull the front waistband of his underpants down and away from his person, and that this was all D.H. did. McDowell admits that this alleged "flanking" still resulted in D.H. exposing his genitals to McDowell, and

10

that McDowell saw that D.H. had nothing on him.  In any event, we view the facts in a light most favorable to D.H. and, therefore, assume that D.H. pulled his underpants down to his ankles, that McDowell instructed him to do so, and that D.H. stood completely nude.

D.H. testified that after he pulled his underpants down, McDowell "bent over," "paused for a little bit," and then told D.H. to put his clothes back.  Because D.H. kept his eyes fixed on the wall in front of him, he did not see what McDowell looked at as he bent over and paused.

No marijuana or other illegal contraband was found on D.H. or in his belongings.  McDowell later admitted that he could have performed the search in the privacy of the bathroom with Deputy Redding present.

Prior to strip searching D.H., Assistant Principal McDowell did not conduct a search of D.H.'s locker, gym locker, or desk.  Before the search of D.H., Deputy Redding and McDowell had never conducted a strip search of a student.  In fact, at the time they searched D.H., Deputy Redding and McDowell were not aware of any other incident in the School District in which a student was asked to remove an article of clothing.  But they also were not aware of any other incident in which a student hid marijuana in his or her underpants.

11

## III.   DISCUSSION

Because McDowell raised the defense of qualified immunity, we first consider whether McDowell's search of D.H. deprived D.H. of a constitutional right.  See Sacramento v. Lewis, 523 U.S. 833, 841 n.5, 118 S. Ct. 1708, 1714 n.5 (1998).  We then discuss whether the law was "clearly established" so as to justify imposition of § 1983 liability.  See id.

### A.    Legal Standards Governing Student Strip Searches

The Fourth Amendment of the United States Constitution guarantees "[t]he right of the people to be secure in their persons . . . against unreasonable searches and seizures."  U.S. Const. amend. IV.  The United States Supreme Court articulated the boundaries of a student's Fourth Amendment rights in a school setting in New Jersey v. T.L.O., 469 U.S. 325, 105 S. Ct. 733 (1985), a non-strip search case.[5]  In T.L.O., the Supreme Court established a two-prong inquiry for determining the constitutional reasonableness of a school official's decision to search a student.

First, the search must be "justified at its inception."  Id. at 341, 105 S. Ct. at 743 (quotation marks omitted).  A search will be justified at its inception if the school official has "reasonable grounds for suspecting that the search will turn up

---

[5]In T.L.O., a high school assistant vice principal searched the purse of a student who had been caught smoking in violation of a school rule.  T.L.O., 469 U.S. at 328, 105 S. Ct. at 736.

12

evidence that the student has violated or is violating either the law or the rules of the school." Id. at 342, 105 S. Ct. at 743.

Second, the scope of the search must be "reasonably related to the circumstances which justified the interference in the first place." Id. at 341, 105 S. Ct. at 743 (quotation marks omitted). The scope of a search will be permissible "when the measures adopted are reasonably related to the objectives of the search and not excessively intrusive in light of the age and sex of the student and the nature of the infraction." Id. at 342, 105 S. Ct. at 743.

This Court applied these T.L.O. factors in the context of a school strip search in Thomas v. Roberts, 261 F.3d 1160 (11th Cir. 2001), vacated on other grounds by 536 U.S. 953, 122 S. Ct. 2653 (2002), reinstated by 323 F.3d 950 (11th Cir. 2003). In Thomas, a school teacher and a police officer, without individualized suspicion, performed a group strip search of at least thirteen 5th grade schoolchildren after $26 went missing. See Thomas, 261 F.3d at 1163-64. This Court had "little trouble" concluding that the group strip search was unconstitutional. Id. at 1167.

Citing the first T.L.O. prong, this Court stated that "a school official must have 'reasonable grounds' for suspecting that a student is guilty of a violation of school rules or the law." Id. This Court noted that while individualized suspicion is not an absolutely necessary element of the reasonableness standard in school

13

searches, the general requirement that officials possess individualized suspicion "is subject to a very limited exception."  Id.  The U.S. Supreme Court outlined this limited exception in Skinner v. Railway Labor Executives' Association, holding that a search may be conducted without individualized suspicion when "the privacy interests implicated by the search are minimal, and . . . an important governmental interest furthered by the intrusion would be placed in jeopardy by a requirement of individualized suspicion."  489 U.S. 602, 624, 109 S. Ct. 1402, 1417 (1989).

Applying the Skinner balancing test, this Court in Thomas noted that "[s]tudents in the school environment have lesser expectations of privacy than members of the general public," but concluded that "schoolchildren retain a legitimate expectation of privacy in their persons, including an expectation that one should be able to avoid the unwanted exposure of one's body, especially one's 'private parts.'"  Thomas, 261 F.3d at 1168.  Thus, requiring students to expose their breasts or genitals represented a "serious intrusion upon the students' personal rights" and, therefore, school officials must possess a "truly important interest that would have otherwise been endangered" in order to justify strip searches without individualized suspicion.  Id. at 1168-69 (quotation marks and alteration omitted).  Because the searches in Thomas were "highly intrusive" and did not advance a "truly important" government interest, this Court concluded they were not justified absent individualized suspicion.  Id.

14

More recently, the United States Supreme Court revisited the T.L.O. factors in the context of a student strip search in Safford Unified School District #1 v. Redding, 557 U.S. 364, 129 S. Ct. 2633 (2009). In Safford, female administrators at a public school strip searched a 13-year-old female student named Savana Redding. Id. at 368, 129 S. Ct. at 2637. The school's policies strictly prohibited the nonmedical use, possession, or sale of any drug on school grounds, including any prescription or over-the-counter medication. Id. at 371, 129 S. Ct. at 2639-40. An assistant principal searched the personal belongings of a student and found an over-the-counter 200 mg naproxen pill (Aleve) and several prescription-strength 400 mg ibuprofen pills (Advil). Id. at 372-73, 129 S. Ct. at 2640. The student claimed that she received the pills from Savana Redding, her friend. Id. at 372-73, 129 S. Ct. at 2640-41.

The assistant principal called Redding into his office and searched her belongings, but found nothing. Id. at 368, 373, 129 S. Ct. 2638, 2640-41. The assistant principal then instructed the female administrative assistant to take Redding to the female nurse's office so that they could search her clothing. Id. at 369, 129 S. Ct. 2638. The assistant and the nurse asked Redding to remove all of her clothing, which she did, leaving her in her bra and underpants. Id. They told Redding to pull her bra out and to the side and shake it, and to pull out the elastic

on her underpants, which she did, thus partially exposing her breasts and pelvic area to some degree.  Id.  No pills were found.  Id.

After restating the applicable T.L.O. factors, the Supreme Court in Safford noted that a student has a subjective expectation of privacy against a strip search, which is an inherently embarrassing, frightening, and humiliating ordeal.  Id. at 374-75, 129 S. Ct. at 2641-42.  Accordingly, the Supreme Court held that a strip search is a "categorically distinct" type of search, "requiring distinct elements of justification on the part of school authorities for going beyond a search of outer clothing and belongings."  Id. at 374, 129 S. Ct. at 2641.  To that end, "when the categorically extreme intrusiveness of a search down to the body of an adolescent requires some justification in suspected facts, general background possibilities fall short; a reasonable search that extensive calls for suspicion that it will pay off."  Id. at 376, 129 S. Ct. at 2642.  This requires that, at a minimum, the search have a "moderate chance of finding evidence of wrongdoing."  Id. at 371, 129 S. Ct. at 2642.

Further, in a school strip search case, the T.L.O. scope prong "requires the support of reasonable suspicion of danger or of resort to underwear for hiding evidence of wrongdoing before a search can reasonably make the quantum leap from outer clothes and backpacks to exposure of intimate parts."  Id. at 377, 129 S. Ct. at 2643.  Thus, the Supreme Court emphasized that the first T.L.O. prong

16

informs the second in the sense that the degree of the intrusion must match the strength of the initial suspicion and the danger the contraband poses. Id. at 378, 129 S. Ct. at 2643.

Applying these principles to the facts before it, the Supreme Court noted that directing Savana Redding to "pull out her bra and the elastic band on her underpants," which necessarily exposed her private parts, even if only partially, qualified as a "categorically distinct" type of search (i.e. a strip search) that required the "distinct elements of justification" discussed above. Id. at 374, 129 S. Ct. at 2641. The Supreme Court stated that "[t]he exact label for this final step in the intrusion is not important, though strip search is a fair way to speak of it." Id. Although the defendants testified that "they did not see anything when Savana followed their instruction," the Supreme Court concluded that it "would not define strip search and its Fourth Amendment consequences in a way that would guarantee litigation about who was looking and how much was seen." Id.

The Supreme Court ultimately concluded that the strip search of Savana Redding was unconstitutional because "the content of the suspicion failed to match the degree of intrusion." Id. at 376, 129 S. Ct. at 2642. Specifically, the presence of over-the-counter medication posed a minimal danger to the student population,

17

and the school administrators had no reason to believe that Redding was hiding the contraband in her underwear.[6]  Id. at 376-77, 129 S. Ct. at 2642-43.

We now apply the T.L.O. and Safford principles to this case.

## B.    Constitutionality of McDowell's Strip Search of D.H.

In the light most favorable to D.H., McDowell's search of D.H. involved D.H. dropping his underpants to his ankles and exposing his genitals to McDowell and, potentially, Redding and the other students in the room.  This search no doubt qualifies as the "categorically distinct" type of search—colloquially referred to as a "strip search"—identified by the Supreme Court in Safford.  See id. at 374, 129 S. Ct. at 2641.  Even so under McDowell's versions of events, in which McDowell admitted that his alleged "flanking" of D.H. exposed D.H.'s genitals to him to some degree.  This "flanking" maneuver would still qualify as a strip search requiring "distinct elements of justification."  See id. (stating that it "would not define strip search and its Fourth Amendment consequences" based on "how much was seen.").  Accordingly, we consider below (1) whether McDowell's strip search

---

[6]The Supreme Court did state initially that the assistant principal's suspicion "was enough to justify a search of Savana's backpack and outer clothing," indicating that the inception prong of T.L.O. was satisfied in this respect.  Safford, 557 U.S. at 373, 129 S. Ct. at 2641; see also id. at 384, 129 S. Ct. at 2647 (Thomas, J., dissenting) ("As the majority rightly concedes, this search was justified at its inception because there were reasonable grounds to suspect that Redding possessed medication that violated school rules.").  However, the Supreme Court clarified that strip searches had stricter requirements under the inception prong.  See id. at 374, 129 S. Ct. at 2641 (recognizing that a strip search is "categorically distinct" from other types of searches and requires "distinct elements of justification on the part of school authorities for going beyond a search of outer clothing and belongings.").

of D.H. contained the "distinct elements of justification . . . for going beyond a search of outer clothing and belongings," and (2) whether the execution of that search was excessive in scope. See id.

### 1.    Inception Prong

As to the first T.L.O. prong, we consider whether McDowell's strip search of D.H. was justified at its inception. Viewed in a light most favorable to D.H., the record provides that: (1) the presence of illegal drugs at an elementary school is a serious problem that may justify a more invasive search; (2) McDowell learned just before the search of D.H. that marijuana had already been found on three of D.H.'s classmates; (3) D.V. had marijuana and specifically told McDowell that D.H. possessed marijuana; (4) Ratcliff informed McDowell, and it was true, that one student (T.D.) had hidden marijuana in the waistband of his underpants; and (5) McDowell believed, albeit mistakenly, that a second student had hidden marijuana in the waistband of his underpants that day. Taken together, these facts demonstrate that McDowell's decision to conduct a strip search of D.H. was reasonable at its inception.

Unlike the search in Safford, the content of McDowell's suspicion matched the degree of his intrusion, at least with respect to his initial decision to perform a strip search of D.H. Two pivotal facts distinguish the search here from Safford. First, while Safford involved a search for non-dangerous, common, over-the-

19

counter medication,[7] McDowell suspected that D.H. possessed an illegal controlled substance. See Vernonia Sch. Dist. 47J v. Acton, 515 U.S. 646, 661, 115 S. Ct. 2386, 2395 (1995) (holding that administrators may have a "compelling" interest in keeping drugs out of schools because "[s]chool years are the time when the physical, psychological, and addictive effects of drugs are most severe"). Second, while the defendants in Safford had no reason whatsoever to believe that the plaintiff was hiding contraband in her underpants, McDowell was told, and it was true, that, on the day he searched D.H., another student had hidden marijuana in the waistband of his underpants. McDowell also mistakenly believed that a second student had also hidden marijuana in the waistband of his underpants. Thus, McDowell's search did not contain the two pivotal characteristics that rendered the Safford defendants' search unconstitutional.

The record here provides the "distinct elements of justification" that were required to conduct a strip search of D.H. Safford, 557 U.S. at 374, 129 S. Ct. at 2641. The discovery of well-hidden marijuana on three students, D.V.'s implication of D.H., and McDowell's understanding that marijuana was discovered in the waistband of students' underpants that day, viewed together, go beyond the

---

[7]We acknowledge that Safford involved, in part, a 400 mg "prescription strength" ibuprofen pill that is not necessarily available over the counter (though one could presumably take two over-the-counter 200 mg ibuprofen pills). However, there is no question that marijuana, a controlled substance, presents a greater danger to school safety than even a "prescription strength" ibuprofen pill.

"general background possibilities" proscribed by the Supreme Court. Id. at 376, 129 S. Ct. 2642. Rather, the record evidence establishes that McDowell had "reasonable grounds for suspecting that the search [would] turn up evidence [that D.H. was] violating . . . the law." T.L.O., 469 U.S. at 342, 105 S. Ct. at 743. In other words, McDowell reasonably suspected that his strip search of D.H. was needed and would "pay off." Safford, 557 U.S. at 376, 129 S. Ct. at 2642.

Indeed, we are hard pressed to identify what more McDowell would have needed to know in order to "make the quantum leap from outer clothes and backpacks to exposure of intimate parts." Id. at 377, 129 S. Ct. at 2643. Perhaps a reliable witness could have not only informed McDowell that D.H. possessed marijuana, but also told him where exactly D.H. kept it. However, given that three other 7th-grade students had marijuana, and one of those students had just produced marijuana from the waistband of his underpants, we do not read Safford as imposing such a stringent requirement on the analysis of the inception prong in a student strip search case. Additionally, the fact that McDowell could have asked D.H. to pull the waistband of his underpants away from his body, rather than drop his underpants, is not the touchstone of our analysis under the inception prong. Making D.H. pull the waistband of his underpants away from his body would have still exposed D.H.'s genitals to McDowell. This waistband maneuver would

21

qualify as a strip search too, requiring "distinct elements of justification."  Safford, 557 U.S. at 374, 129 S. Ct. at 2641.

Ultimately, under the totality of the circumstances, McDowell held a "reasonable suspicion  . . . of resort to underwear for hiding evidence of wrongdoing."  Safford, 557 U.S. at 377, 129 S. Ct. at 2643.  Accordingly, we conclude that the district court erred in ruling that McDowell's strip search of D.H. was not justified at its inception.

2.    Scope Prong

While McDowell's strip search of D.H. was justified at its inception, we readily conclude that forcing D.H. to strip fully naked in front of his peers was unconstitutionally excessive in scope.  Even where a student strip search is justified at its inception, the Fourth Amendment still requires the execution of the search to be reasonable in scope.  Specifically, the "measures adopted" must be "reasonably related to the objectives of the search and not excessively intrusive in light of the age and sex of the student and the nature of the infraction."  Id. at 342, 105 S. Ct. at 743 (emphasis added) (quoting T.L.O., 469 U.S. at 342, 105 S. Ct. at 743).

McDowell's decision to have D.H. fully remove all of his underclothing in front of D.H.'s peers bore no rational relationship to the purpose of the search itself.  That is, McDowell was no more likely to find marijuana on D.H. by

22

performing a fully nude strip search of D.H. in front of his peers than he would have had he employed substantially less invasive means. For example, McDowell could have simply required D.H. to pull the waistband of his underpants away from his body rather than fully remove his underpants. While still a strip search, such a waistband maneuver is no doubt far less invasive than requiring a complete removal of the underpants and would still achieve the purposes of the search in the circumstances here.

McDowell also should have heeded D.H.'s request to perform the strip search in the privacy of the bathroom. In fact, McDowell admitted that there was no reason the search had to be performed with D.H.'s classmates present, as he could have easily performed the search, with Deputy Redding present, in the bathroom. And even if the bathroom was not a feasible alternative, we see no reason in this record why the other students could not have been removed from Deputy Redding's office before commencing the strip search of D.H.

The problem, of course, is that McDowell's arbitrary decision to require D.H. to completely remove his underwear in front of his peers unnecessarily subjected D.H. to a significantly higher level of intrusion. We have no doubt that a fully nude strip search in the presence of one's peers would exponentially intensify the "embarrass[ment], fright[], and humiliati[on]" a student experiences when undergoing a strip search. Safford, 557 U.S. at 374-75, 129 S. Ct. at 2641; see

23

Evans v. Stephens, 407 F.3d 1272, 1281 (11th Cir. 2005) (en banc) (holding that the strip searches of two adult arrestees were unconstitutional, in part, because "little respect for privacy was observed" when "[the plaintiffs were] forced to disrobe . . . in front of [each] other"); see also Justice v. Peachtree City, 961 F.2d 188, 193 (11th Cir. 1992) (holding that the strip search of a juvenile detainee was constitutional, in part, because the officers "us[ed] a room where only the participants were present to conduct the search"). This is particularly true of younger students, whose "adolescent vulnerability intensifies the patent intrusiveness of the exposure." Safford, 557 U.S. at 375, 129 S. Ct. at 2641. In fact, the elevated sense of intrusion was made apparent by D.H. when he asked that the search be conducted in the bathroom so that he was not forced to expose his genitals in front of his peers.

Simply put, while McDowell's decision to strip search D.H. was justified at its inception, his decision to force D.H. to stand fully nude in front of his peers made the search excessive in scope. There was no exigency that prevented McDowell from asking D.H. to pull his waistband away from his body, from taking D.H. to a private place, or from excusing the other students to an area

24

outside of his office.[8]  By forcing D.H. to strip naked in front of his peers,

McDowell exposed D.H. to an unnecessary level of intrusion that rendered the

search excessive in scope and, therefore, unconstitutional.  Because McDowell

violated D.H.'s constitutional rights, we next examine whether clearly established

law put McDowell on notice that he was doing so.

## C.    Clearly Established Law

"A right may be clearly established for qualified immunity purposes in one

of three ways: (1) case law with indistinguishable facts clearly establishing the

constitutional right; (2) a broad statement of principle within the Constitution,

statute, or case law that clearly establishes a constitutional right; or (3) conduct so

egregious that a constitutional right was clearly violated, even in the total absence

of case law."  Hill v. Cundiff, 797 F.3d 948, 979 (11th Cir. 2015) (quotation marks

omitted).  Under the second method, the salient question is whether "every

objectively reasonable government official facing the circumstances would know

---

[8]We need not tease apart the Fourth Amendment consequences of a fully naked strip search from the Fourth Amendment consequences of a strip search performed in front of one's peers.  In this case, both circumstances were present, and their combined presence makes clear that McDowell's strip search of D.H. was unconstitutionally excessive in scope.

We do pause to note, however, that there will rarely, if ever, be a circumstance in which performing a strip search of a student in front of his or her peers, whether involving partial or full exposure of intimate parts, will bear a rational relationship to the purpose of the search itself.  As such, it is best practice for school administrators to perform student strip searches of any kind outside the presence of other students.

Similarly, we can think of no circumstance where it would be permissible for a school administrator to escalate a strip search of a student by forcing him to remove his underwear when—as here—due to the design of the underwear, an exhaustive search could be performed through "flanking."

that the official's conduct did violate federal law when the official acted." Id. (quotation marks omitted). Thus, the relevant question in this case is whether a reasonable government official in McDowell's position as Assistant Principal could have believed that requiring D.H. to strip down to his fully naked body in front of several of his peers was lawful in light of clearly established law. See id.

Viewing all reasonable inferences in favor of D.H., we conclude that a reasonable official in McDowell's position would not have believed that requiring D.H. to strip down to his fully naked body in front of several of his peers was lawful in light of the clearly established principle that a student strip search, even if justified in its inception, must be "reasonably related to the objectives of the search and not excessively intrusive in light of the age and sex of the student and the nature of the infraction." Safford, 557 U.S. at 342, 105 S. Ct. at 743; see also Hill, 797 F.3d at 979 (concluding that a middle school principal's failure to reform the school's sexual harassment and recordkeeping policies in response to the rape of a one student by another was unlawful in light of the clearly established principle that deliberate indifference to sexual harassment is an equal protection violation). Accordingly, we affirm the district court's denial of McDowell's motion for summary judgment based on qualified immunity.

26

**D.    D.H.'s Summary Judgment Motion and Remaining Issues for Trial**

The district court also granted partial summary judgment in favor of D.H., held that McDowell was not entitled to qualified immunity under any version of the facts, and concluded that the only issue left was a jury trial as to the amount of D.H.'s damages against McDowell. This part of the district court's order contained some error. While McDowell violated a clearly established constitutional right under D.H.'s version of events, the same cannot be said under McDowell's version of events, creating a jury issue for trial and precluding summary judgment in favor of D.H. McDowell testified that he only asked D.H. to pull the waistband of his underpants away from his body and that such "flanking" is all that D.H. did. What version of events the jury believes affects the qualified immunity analysis.

Recently, the United States Supreme Court reiterated the stringent requirements for recognizing a public official's actions as violating clearly established law. See Mullenix v. Luna, 557 U.S. ___, 136 S. Ct. 305 (2015). D.H.'s version of events easily meets this stringent requirement of clearly established law. See Safford, 557 U.S. at 342, 105 S. Ct. at 743; Hill, 797 F.3d at 979. However, McDowell's version of events does not. Mullenix, 557 U.S. at ___, 136 S. Ct. at 309. An official in McDowell's position could have reasonably believed that requiring D.H. to pull the waistband of his underpants briefly away

27

from his body in a room with a few peers was lawful in light of T.L.O. and

Safford.  See Hill, 797 F.3d at 979

Whether D.H. pulled the waistband of his underpants away from his body or

completely removed his underpants is a genuine issue of material fact for a jury to

decide.  If McDowell instructed D.H. to pull down his underpants, and D.H. did so,

then McDowell violated a constitutional right under clearly established law and is

liable under § 1983.  However, if McDowell only instructed D.H. to pull the

waistband of his underpants briefly away from his body and did not otherwise

indicate to D.H. that he had to strip fully nude, then McDowell did not violate a

clearly established constitutional right and is entitled to qualified immunity against

D.H.'s § 1983 claim.  Because a genuine issue of material fact exists, the district

court erred in granting D.H's motion for partial summary judgment as to liability

and leaving only damages for trial.  See Gennusa v. Canova, 748 F.3d 1103, 1108

(11th Cir. 2014) ("Summary judgment is appropriate if there are no genuine issues

of material fact and a party is entitled to judgment as a matter of law.").

In light of the above, we vacate the portion of the district court's September

30, 2014 order granting D.H.'s motion for partial summary judgment.  A jury must

decide the factual issues of whether McDowell instructed D.H. to pull the elastic

waistband of his underpants away from his body, and that D.H. did so, or whether

McDowell instructed D.H. to pull his underpants down to his ankles, and that D.H.

28

did so.  Should the jury find that D.H. merely pulled the elastic waistband of his underpants away from his body at McDowell's direction, then McDowell is entitled to qualified immunity.  However, should the jury find that D.H. pulled his underpants down to his ankles at McDowell's direction, then McDowell is liable under § 1983 and the jury should also determine damages.

## IV.    CONCLUSION

For the foregoing reasons, we affirm the portion of the district court's September 30, 2014 order to the extent it (1) concluded that McDowell's strip search of D.H. was excessive in scope, and (2) denied McDowell's motion for summary judgment based on qualified immunity.  We reverse the portion of the district court's September 30, 2014 order to the extent it (1) concluded that McDowell's search of D.H. was not justified at its inception and (2) granted D.H.'s motion for partial summary judgment against McDowell.  The case is **REMANDED** for a trial and further proceedings consistent with this opinion.